Under appropriate circumstances, work-related depression or other mental illness may be a compensable occupational disease. Pitillo v.N.C. Dept. of Envtl. Health and Natural Resources, 566 S.E.2d 807, 813
(2002) (citing to Jordan v. Central Piedmont Comm. College,124 N.C. App. 112, 476 S.E.2d 410 (1996); Baker v. City of Stanford,120 N.C. App. 783, 463 S.E.2d 559 (1995), disc. review denied,342 N.C. 651, 467 S.E.2d 703 (1996)). However, the claimant must prove that the mental illness or injury was due to stresses or conditions different from those borne by the general public. Id. (citing to Woodyv. Thomasville Upholstery, Inc., 355 N.C. 483, 562 S.E.2d 422 (2002) (adopting dissent in 146 N.C. App. 187, 202, 552 S.E.2d 202, 211
(2001))). Thus, the claimant must establish both that her psychological illness is `due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment' and that it is not `an ordinary disease of life to which the general public is equally exposed.' Id. (citing to Booker v. Medical Center, 297 N.C. 458, 468,256 S.E.2d 189, 196 (1979) (quoting N.C. Gen. Stat. § 97-53(13) (2001))).
A disease is `characteristic' of a profession when there is a recognizable link between the nature of the job and an increased risk of contracting the disease in question. Keller v. City of Wilmington PoliceDept., 65 N.C. App. 675, 677, 309 S.E.2d 543, 545 (1983) (citing Booker,297 N.C. at 472, 256 S.E.2d at 198). Additionally, a disease is `peculiar to the occupation' when `the conditions of . . . employment . . . result in a hazard [that] distinguishes it in character from the general run of occupations . . . and is in excess of that attending employment in general. Id. (citing Booker, 297 N.C. at 473, 256 S.E.2d at 199).
In the present case before the Commission, the majority has found in its Opinion and Award, that plaintiff's diagnosed depression, dysthymia, insomnia, and other psychological problems were not "characteristic of" and "peculiar to" plaintiff's employment with defendant as a nurse. Rather, the majority erred in finding plaintiff's condition to be an ordinary disease of life to which the public, not so employed, is equally exposed. The majority has relied upon Woody v. Thomasville Upholstery,355 N.C. 483, 562 S.E.2d 422 (2002), rev'g per curiam for reasons statein Judge Martin's dissent, 146 N.C. App. 187, 552 S.E.2d 202 (2001), in which the claimant's depression and other mental problems, as a consequence of difficulties with working for an abusive supervisor, were found to be no more than conditions and occurrences to which the general public is equally exposed outside the workplace in everyday life.552 S.E.2d at 211-212. However, the facts in the present case are distinguishable from Woody.
The plaintiff before this Commission did experience many of the same work-related stressors that the general public is exposed to outside the workplace in everyday life, however much of her stressors exceeded what could reasonably be deemed as normal, day-to-day stressors and were indeed characteristic of and peculiar to plaintiff's employment as a nurse. Contemporary with the advancement of plaintiff's depression, she experienced severe bouts of insomnia as a consequence of the rotating shifts that she was required to work. Plaintiff's husband, Milton Lewis, and plaintiff's psychiatrist, Nancy L. Roman, M.D., both testified that plaintiff was required to work erratic shifts with constantly changing hours. Tr. at p. 18; Depo. of Dr. Roman at p. 25. When plaintiff made requests that defendant work out a better schedule for her because of her insomnia and resulting depression, her requests were not met. Depo. of Dr. Roman at p. 26. Such erratic shift work is not typical of the general public. Due to the 24-hour operations of a hospital and its need for around-the-clock nursing support, such conditions can only be described as characteristic of and peculiar to the field of nursing.
In addition to plaintiff's depression as a consequence of her insomnia, a great source of plaintiff's depression was caused by her proximity to chronically ill and dying patients. From 1973 through the early 1990's, plaintiff's duty as a registered nurse employed by defendant largely involved working with diabetic patients, teaching them how to care for themselves and how to manage their disease effectively. Tr. at p. 10. Her role as a nurse was to help people to get well through education and training. Id. However, during the early 1990's defendant experienced a reorganization of its hospitals. Tr. at p. 9. In order to maintain her employment with defendant, plaintiff was required to care for terminally ill patients, many of whom were inflicted with AIDS, terminal cancer, and end-stage renal disease. Tr. at pp. 10 51; Depo. of Dr. Roman at p. 36. Plaintiff grew close to many of her patients, only to have them die while in her care, which proved to be very difficult for plaintiff. Tr. at p. 10. Plaintiff soon found that defendant provided no support structure for her to fall back upon to help her and other nurses to deal with the grief experienced from losing patients. Tr. at p. 11; Depo. of Dr. Roman at p. 37. This factor caused plaintiff a good deal of stress and contributed to the development of her depression and dysthymia. Depo. of Dr. Roman at p. 67. It cannot be said that the general public is equally exposed outside the workplace to terminally ill and dying patients in everyday life. Such occurrences are undoubtedly characteristic of and peculiar to the field of nursing.
Quite similarly, the general public is not equally exposed to the awesome burden of facing life and death situations during a routine day at work. While doing post-operative work for defendant, plaintiff was made charge nurse on many of her shifts, meaning it was her responsibility to delegate duties to other nurses on her shift. Tr. at pp. 14 43-44. Often during these times, defendant required plaintiff to run her shift short-staffed and under great time pressures with more responsibilities than was possible to manage. Tr. at pp. 24 31; Depo. of Dr. Roman at pp. 31 55. Plaintiff felt that she had no choice than to report to the hospital hours before her shift started just to be sure that her staff could be prepared to meet the high demands defendant required of them. Depo. of Dr. Roman at p. 41. Being a professional caregiver, plaintiff felt it was her responsibility to ensure that patient care did not deteriorate and that the needs of her patients were met, despite defendants demands placed upon her and her staff. Depo. of Dr. Roman at p. 42 Defendant also required plaintiff to perform post-anesthesia work with minimal training or experience. Depo. of Dr. Roman at pp. 39-40. This caused great distress for plaintiff, who felt that she was placing her patients at risk of death or injury. Depo. of Dr. Roman at p. 40. Perhaps short-staffing, minimal training, and high productivity demands are common to many jobs, yet the general public, unlike plaintiff, does not carry the burden of knowing that a mistake or failure on the job could lead to death or injury. Such burden of facing life and death situations on a daily basis is certainly characteristic of and peculiar to the field of nursing.
This Commission has seen fit to recognize causal links between certain occupations and an increased risk of contracting an occupational disease. In Pulley v. City of Durham, 121 N.C. App. 688, 468 S.E.2d 506
(1996), the North Carolina Court of Appeals affirmed the Full Commission's findings that there is a recognizable link between the nature of police work and an increased risk of contracting depression.Id. at 694, 468 S.E.2d at 510; see also Harvey v. Raleigh Police Dept.,85 N.C. App. 540, 355 S.E.2d 147, cert. denied, 320 N.C. 631, 360 S.E.2d 86
(1987). The Commission had found that the claimant in Pulley suffered from depression as a consequence of work-related stressors, which included claimant's work-related exposure to instances of personal injury and death. Id. Just like the claimant in Pulley, plaintiff in the present case before us has seen her equal share of personal injury and death while in defendant's employ. Thus, the majority has erred in failing to recognize a causal link between nursing and an increased risk of contracting depression in spite of the fact that such recognition has been afforded to members of law enforcement.
Even if the majority fails to recognize a causal link between nursing and an increased risk of contracting depression, plaintiff has met her burden of proving that her occupational exposure to stress was such a significant factor in the development of her depression and dysthymia that without it the diseases' development would not have been to such an extent that it caused the physical disability that resulted in plaintiff's incapacity for work. See Perry v. Burlington Industries,Inc., 80 N.C. App. 650, 343 S.E.2d 215 (1986) (citing Rutledge v. TultexCorp., 308 N.C. 85, 101, 301 S.E.2d 359, 369-70 (1983)). Dr. Roman, plaintiff's psychiatrist, testified that plaintiff's employment with defendant placed her at greater risk of contracting depressive and dysthymic disorders as opposed to the general public, and that the duties of plaintiff's employment caused, or substantially contributed to, the development of plaintiff's depressive and dysthymic disorders. Depo. of Dr. Roman at pp. 33-34. The record is replete with evidence that stressful events at work caused plaintiff to experience severe depression, dysthymia, insomnia, cognitive function impairment (i.e. forgetfulness, inability to concentrate), psychomotor retardation (i.e. slowed speech, trouble making eye contact), suicidal ideation, and a host of physical complaints attributed to stress, including functional bowel disease, fibromyalgia, reflux symptoms, night sweats, fatigue, and heart palpitations.
Despite the evidence of plaintiff's occupational disease and its causal relationship to her employment with defendant, the majority has stated that plaintiff's depressive disorder is more likely a consequence of the recent deaths of her father and half-sister. There is no question that such events contributed to plaintiff's depression; however, both Mr. Lewis and Dr. Roman testified that plaintiff's depression preceded these deaths. Tr. at p. 7; Depo. of Dr. Roman at p. 27. Additionally, they both testified that after these deaths, plaintiff looked forward to returning to work and was able to focus on her work despite her grief. Tr. at p. 30; Depo. of Dr. Roman at p. 24. It cannot be said that plaintiff's grief did not contribute to her depression, yet it is clear from Dr. Roman's testimony that absent her work stressor's, plaintiff would not have progressed to a severe depressive state. Depo. of Dr. Roman at p. 67. Moreover, N.C. Gen. Stat. § 97-53(13) does not require that the conditions of employment be the exclusive cause of an occupational disease in order to be compensable. Humphries v. Cone MillsCorporation, 52 N.C. App. 612, 614, 279 S.E.2d 56, 58 (1981). Thus, just because plaintiff's depression can be related in part to personal stressors does not preclude compensation for plaintiff's occupational exposure to severe stress.
Finally, the majority's Opinion and Award ignores the fact that normal work stressors, common to the general public, can reach a threshold at which they cause occupational injury, as in the case before us. Perhaps the Commission should consider the approach of other jurisdictions, in particularly the State of Wisconsin. In attempting to find an effective means of evaluating an employee's claim of mental injury without opening a floodgate of fraudulent claims, the Wisconsin Court of Appeals, inSchool Dist. No. 1 v. DILHR, 62 Wis.2d 370 377-78, 215 N.W.2d 373, 377
(1974), adopted the "unusual stress" test in response to the court's concern with the difficulties surrounding proof of the existence of severe emotional harm and the proof of a causal relationship between the injury and the employment. United Parcel Service, Inc. v. Lust,208 Wis.2d 306, 320, 560 N.W.2d 301, 306 (1997). The test requires a showing that a non-traumatically caused mental injury resulted from a situation of greater dimensions than the day-to-day emotional strain and tension that all employees must experience. Id. at 317. Based on the record evidence of plaintiff's work-related stressors during her employment with defendant, there is sufficient showing that such stressors were of a greater dimension and a heightened severity as opposed to an average worker's day-to-day emotional strain.
The majority has erred in failing to award compensation to plaintiff for her development of depression and dysthymia, each an occupational disease, as a result of extreme work-related stress experienced during her employment with defendant. In doing so, the majority creates a presumption that any type of mental injury causally related to day-to-day work-related stressors cannot be compensable no matter how great or severe that stressor may be. The majority fails to consider that a normal day-to-day stressor can exceed a threshold in which it surpasses the level of normal work-related stress experienced by the general public to become an "unusual" stressor and the cause of an occupational mental injury. Moreover, the majority has failed to recognize a causal link between nursing and an increased risk of contracting depression despite the evidence of record.
For these reasons, I respectfully dissent from the majority's Opinion and Award.
 S/_____________ THOMAS J. BOLCH COMMISSIONER